## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| JEFFRY IRVING<br>216 S. Patrick St.<br>Alexandria, VA 22314<br>     Plaintiff[1],<br><br>v.<br><br>PAE GOVERNMENT SERVICES, INC.<br>1320 North Courthouse Road<br>Suite 800<br>Arlington, VA 22201<br><br>and<br><br>STEPHEN EASLEY<br>1320 North Courthouse Road<br>Suite 800<br>Arlington, VA 22201and<br><br>RICHARD GREENE<br>1320 North Courthouse Road<br>Suite 800<br>Arlington, VA 22201and<br><br>JANICE PFUNDHELLER<br>1320 North Courthouse Road<br>Suite 800<br>Arlington, VA 22201<br>and<br><br>KATHLEEN LONG<br>1320 North Courthouse Road<br>Suite 800<br>Arlington, VA 22201<br>    Defendants. | Civil Action No.<br><br>**JURY TRIAL DEMAND** |

## COMPLAINT

---

[1] To avoid retaliation, Plaintiff has used the address of his counsel.

1

1.      Jeffry Irving ("Mr. Irving") by and through his attorney, herein files suit against PAE Government Services, Inc. ("PAE"); Stephen Easley ("Mr. Easley); Richard Greene ("Mr. Greene"); Janice Pfundheller ("Ms. Pfundheller"); and Kathleen Long ("Ms. Long") for their causes of action states as follows:

## Introduction

2.      This is a civil action filed by Mr. Irving against PAE, Mr. Easley, Mr. Greene, Ms. Pfundheller, and Ms. Long in their official and individual capacities.  This action is brought under the False Claims Act, 31 U.S.C § 3730(h) ("FCA"), the Civil Rights Act of 42 U.S.C. § 1983 ("§ 1983"), and common law breach of contract.

3.      Mr. Irving alleges that Defendants retaliated against him for making disclosures protected by the FCA related to the wrongful and fraudulent misappropriation of public funds and violations of contracts[2] with the United States Department of State ("DOS") by PAE staff, and for Mr. Irving reporting Defendants' misconduct.

4.      Mr. Irving alleges that Defendants retaliated against him for exercising his constitutional right of free speech as a private citizen for speaking out on a matter of public concern.

5.      Mr. Irving alleges that Defendants Easley and PAE failed to perform and honor their promises and obligations under a severance contract that was formed on October 19, 2015.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and under 31 U.S.C. § 3732(a) because it is an action authorized by the laws of the United States, namely the FCA and § 1983.

---

[2] DOS contract numbers SAQMMA15C0032, SAQMMA15C0003, SAQMMA15C0016, and SAQMMA15R0059, are just some examples of the contracts that PAE has violated.

7.     This Court has supplemental subject matter jurisdiction over Mr. Irving's breach of contract claim pursuant to 28 U.S.C. § 1367, as it arises from a common nucleus of facts as his federal law claims.

8.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §3732 because PAE transacts business in this judicial district. PAE has its publicly listed offices in Arlington, Virginia.  Defendants have substantial contacts with and conduct business in the Commonwealth of Virginia.

9.     Venue in this district is appropriate pursuant to 28 U.S.C. § 1391 because all Defendants reside in this judicial district and have sufficient contacts for personal jurisdiction and pursuant to 31 U.S.C. § 3732.  It is also a judicial district where a substantial part of the events or omissions giving rise to the claims occurred, because Mr. Easley was operating out of PAE's office in Arlington when he retaliated against Mr. Irving.

## THE PARTIES

10.     Mr. Irving is a resident of Alexandria, Virginia. He was the Director of International Security from 2011 to 2014 with PAE, until his position changed to Deputy Program Manager ("DPM") for the DOS Bridge Afghanistan Security Task Order in Kabul.

11.     PAE is a California for-profit corporation and maintains a registered office in Arlington, Virginia. PAE is a government contractor.

12.     PAE has numerous United States government contracts to provide an array of goods and services. Among these goods and services is the provision of support services to U.S. government entities both domestically and internationally at forward operating areas.

13.     Mr. Easley resides in Ashburn, Virginia.  Mr. Easley was a PAE director and Program Implementer during the time of Mr. Irving's employment with PAE.

3

14.    Mr. Greene resides in Commonwealth of Virginia. Mr. Greene was a PAE President of Global Logistics and Stability Operations during the time of Mr. Irving's employment with PAE.

15.    Ms. Pfundheller resides in Washington state.  She was PAE's Vice President of Governance and Institutional Development during the time of Mr. Irving's employment with PAE.

16.    Ms. Long resides in the Commonwealth of Virginia.  She was a Director, Human Resources, PAE Governance and Institutional Development during the time of Mr. Irving's employment with PAE.

## FACTUAL ALLEGATIONS

**About Mr. Irving's Employment**

17.    Mr. Irving worked for PAE from January of 2011 until October of 2015.

18.    Mr. Irving began working for PAE as the International Security Manager/Chief of Security and later as the Deputy Program Manager in Kabul, Afghanistan in January of 2015.

19.    As the Deputy Program Manager in Afghanistan, Mr. Irving's duties included serving as International Security Manager/Chief of Security. He was the senior PAE in-country manager responsible for all aspects of security to include global corporate security policies, procedures; planning; oversight and compliance; protection of domestic and overseas employees and other assets; industrial security; investigations; governmental/program classified security; in-country management; operations and support; and security plans and proposals for new business development worldwide.

20.    Mr. Irving performed admirably, as evidenced by his outstanding performance reviews.

4

21.     Mr. Irving faithfully helped PAE carry out its obligations to provide the United States government with top tier support and services.

22.     Mr. Irving was also responsible for advising, teaching, mentoring, and coaching leaders, executives, directors and managers within PAE on global security protocols and risk mitigation.

23.     In Kabul, Mr. Irving observed both shocking misconduct and egregiously low standards.

24.     Mr. Irving reported no less than six violations to PAE management. These reports included (1) PAE fraudulently billing the DOS for more time than its staff had actually worked in violation of its contractual duties to the DOS; (2) PAE engaging in corrupt and noncompliant procurement practices in violation of its contractual duties to the DOS; (3) PAE failing to acquire and issue the proper type and number of weapons to its employees in violation of its contractual duties to the DOS; (4) PAE procuring and using noncompliant body armor in violation of its contractual duties to the DOS; (5) PAE failing to follow U.S. mail handling laws, protocol, and procedures in violation of its contractual duties to the DOS; and (6) PAE misusing government furnished equipment for black market activity in violation of its contractual duties to the DOS, as described in detail below:

25.     Mr. Irving reported these violations to individuals at PAE and DOS, as follows:

### PAE Fraudulently Billed the DOS for Services Never Rendered in Violation of its Contractual Duties to the DOS

26.     Mr. Irving reported, numerous times, that contractors were billing ten-hour workdays six days a week to the DOS without working the stated hours.

27.     Mr. Irving reported this issue to Brad Baldwin, PAE Bridge Afghanistan Security ("BAS") Senior Operations Specialist; Christine Trostle, BAS Subcontracts Manager; Stephen

Easley, PAE Program Implementer; Devin Reynolds, BAS Static Security Chief; Ralph Brugueras, BAS Quality Assurance Chief; Bill Callahan, PAE Deputy Chief of Team Administration; and Fariza Shah.

28.    Mr. Irving also reiterated his concerns regarding fraudulent billing to Ms. Pfundheller, PAE Vice President of Governance and Institutional Development; Allison Eastridge, PAE Director, Governance and Institutional Development; Carson Gemignani, PAE Governance and Institutional Development Operations Director; Jessica Bejarano, PAE Director and Chief Ethics & Compliance Officer; Mark Hunter, BAS Mobile Security Chief; Devin Reynolds, BAS Static Security Chief; and individuals within the DOS.

29.    Mr. Irving reported these instances from February 2015 to his termination in October of 2015.

30.    This issue was consistently reported to the highest level of officials within PAE up to and including his exit and termination interview on October 19, 2015.

31.    Mr. Irving informed Karl Williams, PAE Chief Operating Officer, about the fraudulent billing practices on October 22, 2015.

32.    Despite these numerous reports, PAE did not pursue the issue although they acknowledged the practice.

33.    PAE enjoys a superior reputation for its work and standards within the government contracting community. Despite this reputation, PAE has consistently abused United States government resources and overbilled the United States for its services, as recently uncovered in the United States ex rel Walker v. PAE, et al. case.

### PAE Engaged in Corrupt and Noncompliant Procurement Practices in Violation of its Contractual Duties to the DOS

34.    Mr. Irving raised concerns relating to the purchase and maintenance of faulty

equipment between late May of 2015 to the date of his termination in October of 2015.

35.     Mr. Irving also raised concerns over purchase orders, delivery invoices, Afghanistan customs documents, and email exchanges between Mr. Baldwin, Mr. Easley, Ms. Pfundheller, Ms. Bejarano, Ms. Trostle, Mr. Hunter, Mr. Brugueras, Jon Dobre, PAE Deputy Program Manager for Corrections System Support Program ("CSSP") in Kabul, and DOS employees.

36.     Mr. Irving learned through personal conversations with Rich Greene, PAE President of Global Logistics and Stability Operations and another source, that the body armor PAE purchased for use in Afghanistan was noncompliant, in violation of DOS contracts.

37.     After Mr. Irving's termination, PAE Program Manager, Phillip Derman, PAE Project and Program Manager for Africa Programs, confirmed to Mike Westphal, a senior PAE Business Development employee, that PAE leadership also approved procurement and issuance of noncompliant body armor to one or more task orders under his management, in violation of DOS contracts.

### PAE Failed to Acquire and Issue the Proper Type and Number of Weapons to its Employees in Violation of its Contractual Duties to the DOS

38. From February 2015 until October of 2015, Mr. Irving persistently raised issues in routine e-mails and formal weekly program calls with Mr. Baldwin and Mr. Easley, and periodic formal program meetings with DOS Contracting Officer Representative ("COR") Reilly, and COR Lacy regarding a lack of armaments for the BAS security team. Mr. Irving also relayed these concerns to Ms. Pfundheller and Ms. Eastridge.

39. Mr. Irving's security team was either under- or completely unequipped while serving as security contractors to the DOS in a war zone.

40. The lack of armaments for the security staff placed PAE in violation of DOS contract requirements in the BAS Task Order.

41. At no point from February 2015 to October of 2015 did PAE move to correct this action.

## PAE's Procurement and Use of Noncompliant Body Armor in Violation of its Contractual Duties to the DOS

42. During 2011 up until his termination in October 2015, Mr. Irving performed duties related to policies and procedures regarding the use of compliant and functional body armor.

43. Pursuant to its contracts with DOS, PAE was obligated to provide compliant and functional body armor to its employees, subcontractors, partners and official visitors.

44. Mr. Irving informed PAE of noncompliant body armor and improper procurement issues from mid-February of 2015 to his termination. Specifically, Mr. Irving reported that some of PAE's body armor provided to individuals outside the continental United States ("OCONUS") was noncompliant, leaving employees vulnerable in high threat areas.

45. Among the issues raised were that body armor provided to PAE employees was faulty and below standard and procured from prohibited foreign manufacturers, in violation of U.S. laws.

46. The National Institute of Justice ("NIJ") publishes standards and protocols that are recognized and accepted worldwide, including DOS/INL programs, as the performance benchmark for ballistic-resistant body armor.

47. As DPM, Mr. Irving oversaw Mr. Reynolds' field testing of the soft armor component and vest carrier of PAE's body armor in accordance with NIJ recommended field test protocols. The NIJ field test of the PAE body armor passed a 9mm handgun test of three shots. However, the field test was inconclusive and rendered the soft armor component *possibly* sufficient only when worn in conjunction with NIJ certified ballistic hard plates.

8

48. DOS COR Reilly signed his approval in red marker on the actual ballistic portion of the soft armor to endorse and validate the field ballistic test and adjudicate the vest as noncompliant, wholly unsafe and unfit for its intended purpose.

49. After further visual inspection by Mr. Irving, Mr. Reynolds, Mr. Hunter, and two DOS CORs, they determined that the body armor was not typical of compliant construction and determined that the body armor was likely manufactured in China.

50. As International Security Manager/Chief of Security from 2011 until late 2014, Mr. Irving also reported the body armor issue to Mike Dignam, then-PAE President; Tina Dolph, PAE Vice President; Mark Jorden, PAE Director of Performance Excellence; Stacy DuPreez, Director of Africa Programs; Dan Rivera, Afghanistan Country Manager; and William Lietzau, PAE Deputy General Counsel.

51. Mr. Irving specifically informed Mr. Derman, then-Acting Africa Programs Program Manager, in late 2013 or early 2014 that body armor destined for Africa was noncompliant.

52. Mr. Irving routinely reported that PAE's body armor was noncompliant to Mr. Baldwin, Mr. Easley, Ms. Pfundheller, Mr. Dobre, COR Reilly, COR Lacy, Mr. Reynolds, Mr. Hunter, Ms. Trostle, and Mr. Brugueras.

### PAE's Failure to Follow U.S. Mail Handling Laws, Protocol, and Procedures in Violation of its Contractual Duties to the DOS

53.    Mr. Irving raised concerns with PAE HQ and field leadership and staff regarding the United States Postal Service ("USPS") mail handling and access to the postal system. Mr. Irving raised these concerns from February 2015 up to his termination in October 2015.

54.    Mr. Irving consistently raised concerns about PAE's failure to follow USPS mail handling and storage procedure violations to Mr. Baldwin, Mr. Easley, Ms. Pfundheller, Ms. Eastridge, Mr. Dobre, Mr. Callahan, Ms. Trostle, Mr. Hunter, and Mr. Brugueras because he

knew that violating U.S. law was a violation of the DOS contracts and he was concerned about the in-country security ramifications of those activities.

55.     More specifically, in meetings held on May 14, 2015 and July 25, 2015 with PAE Kabul program managers that focused on mail privileges, Mr. Irving informed all attendees that PAE staff consistently and negligently left mail in vehicles overnight, which was significant because these vehicles, although within PAE's base, were unsecured.

56.     Further, PAE officials often exploited control of mail systems as a *quid pro quo* to unlawfully receiving "favors" from employees.

57.     Mr. Dobre and Terry Manley, Facilities Supervisor for the PAE CSSP Program in Kabul, conceded that mail privileges were restricted due to the necessity of entering into personal agreements with USPS officials in Kabul that allowed PAE to circumvent USPS laws and DOS mail handling regulations and security protocols.

58.     Despite Mr. Irving's specific and numerous reports, PAE leadership refused to intervene or correct these issues despite even Mr. Greene being aware of the issue.

### PAE's Misuse of Government Provided Equipment for Black Market Activity in Violation of its Contractual Duties to the DOS

59.     Mr. Irving witnessed and reported the misuse of government furnished equipment ("GFE") in black market activity involving the illegal transportation of alcohol beginning in late August to mid-September of 2015 to Mr. Hunter, Mr. Easley, Ms. Pfundheller, and Mr. Dobre.

60.     More specifically, Mr. Irving reported that PAE staff, including Mr. Hunter, were using fully-armored SUVs provided by the DOS to unlawfully transport large quantities of alcohol to PAE's base. This activity was in violation of the DOS contracts.

61.     While the consumption of alcohol was legal on PAE's base, the PAE staff transport of the alcohol using U.S. government-furnished vehicles off-base violated numerous

10

Afghan laws and was a misappropriation of the GFE.  The practice unnecessarily and illegally placed PAE's private mobile security subcontractors at great physical, legal and business risk.

62.      PAE staff even used GFE to transport alcohol at times when PAEs mobile operational movements were suspended and not authorized by the DOS Regional Security Officer due to persistent credible and specific high security threats to PAE programs and personnel, which put PAE staff at high risk.

63.      After these disclosures, Mr. Irving became the target of complaints and agitation in emails from Mr. Hunter, Mr. Dobre and other PAE staff in Kabul to PAE leadership in Virginia.

### PAE terminated Mr. Irving Because of His Lawful Acts to Stop PAE's FCA Violations

64.      As a result of Mr. Irving's diligence in ¶¶ 26-32, United States government officials and PAE executives became aware of PAE's fraudulent billing practices.

65.      As a result of Mr. Irving's diligence in ¶¶ 34-37, United States government officials and PAE executives were notified of PAE's corrupt and noncompliant procurement procedures.

66.      As a result of Mr. Irving's due diligence in ¶¶ 38-41, United States government officials and PAE executives were notified of PAE's failure to acquire and issue the proper type and number of weapons to its employees in violation of its contractual duties to DOS.

67.      As a result of Mr. Irving's diligence in ¶¶ 42-52, United States government officials and PAE executives became aware of PAE's procurement and use of noncompliant body armor in violation of its contractual duties to DOS.

68.     As a result of Mr. Irving's due diligence in ¶¶ 53-58, PAE executives were notified of PAE's failure to follow U.S. mail handling laws, protocol, and procedures in violation of its contractual duties to DOS.

69.     As a result of Mr. Irving's due diligence in ¶ 59-63, PAE executives were notified of PAE's misuse of government furnished equipment for black market activity in violation of its contractual duties to DOS.

70.     Mr. Irving regularly provided counsel and provided notice of the noncompliant behavior of his subordinates. Mr. Irving's Personal Goal Statements provided to PAE reflect his high expectations for compliance, professionalism, and the standards of his subordinates.

71.     On October 20, 2015, PAE terminated Mr. Irving's employment for the pretextual reason that he had failed to discipline employees under his supervision, when in fact he had disciplined the employees in question.

72.     PAE failed to follow its progressive discipline policy in terminating Mr. Irving.

73.     Mr. Irving's termination was the result of him reporting PAE's numerous violations and the severe security hazards and compromising risks that they presented to PAE's employees, subcontractors, partners and official visitors.

74.     After Mr. Irving was terminated, he believes that PAE provided derogatory information to a U.S. Defense Security Service agent retained on behalf of OPM/DSS during Mr. Irving's routine Periodic Review ("PR") investigation to retain his "Top Secret" security clearance based on his interview with the investigator and things she mentioned to him that only PAE would know.

75.     As of December 30, 2016, Mr. Irving had not yet received final adjudication of his TS security clearance that expired in October 2015, which has affected his job prospects and ability to secure comparable employment.

### PAE's Severance Offer

76.     At the termination meeting, Mr. Easley offered Mr. Irving normal salary (base salary with the additional 70% plus-ups) and performance bonus through December 31, 2015 to complete Mr. Irving's employment contract, PTO and benefits (life, medical insurance, etc.), and positive professional referrals.

77.     Mr. Easley told Mr. Irving to accept the offer, stating that it would allow Mr. Irving a reasonable amount of time to find new employment.

78.     Mr. Irving repeated Mr. Easley's offer twice to make sure he fully understood what Mr. Easley was offering him.  When Mr. Easley confirmed, Mr. Irving accepted Mr. Easley's offer.

79.     Contrary to the terms that Mr. Irving and Mr. Easley had agreed upon, the letter that PAE later sent Mr. Irving did not reflect the oral contract they had executed on October 19, 2015, and offered him less compensation than what was agreed upon.

### COUNT I

**False Claims Act Retaliation, 31 U.S.C. § 3730(h)**
**Against Defendants PAE, Easley, Greene, Pfundheller, and Long**
**in their Official and Individual Capacities**

80.     Mr. Irving realleges and incorporates the allegations set forth in ¶¶ 1 through 79, as though fully alleged herein.

81.     PAE knowingly presented or caused to be presented to the United States, false or fraudulent claims for payment or approval, more specifically PAE submitted false claims for payment to the government related its contracts with the DOS.

82.     The United States, unaware of the falsity of the claim and statements made by PAE and in reliance on the accuracy of PAE's claims, paid PAE, which was a false claim of public funds.

83.     PAE knowingly made, used, or caused to be made or use, a false record or statement material to a false or fraudulent claim.

84.     PAE knowingly failed to disclose material facts to obtain payment or approval pursuant to its contracts with the United States government in violation of 31 U.S.C. §3729(a)(1)(A).

85.     Defendants conspired to commit violations of 31 U.S.C. § 3729(A), (B), (D), and (G).

86.     Mr. Irving believed in good faith that PAE's misappropriation of the government funds was in violation of the FCA and took lawful action in furtherance of a FCA action by investigating and raising concerns to PAE and DOS personnel that he believed there was a deliberate attempt to defraud the federal government by the behavior described in ¶¶ 26-63.

87.     A reasonable employee in the same or similar circumstances as Mr. Irving might believe that PAE was committing fraud against the government.

88.     Defendants had a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a FCA action.

89.     After Mr. Irving engaged in protected conduct, Mr. Easley, Mr. Greene, Ms. Pfundheller and Ms. Long almost immediately retaliated against Mr. Irving by targeting him for termination.

90.     Defendants terminated Mr. Irving because of his lawful acts to stop PAE from violating the FCA, as described in ¶¶ 64-75.

91.     Defendant would not have taken these retaliatory actions against Mr. Irving if it were not for his disclosure of the violations mentioned in ¶¶ 26-63.

92.     Mr. Irving has suffered and continues to suffer damages as a result of Defendants' retaliation.

## COUNT II

**Retaliation for Exercise of Free Speech the Civil Rights Act of 1871
42 U.S.C. § 1983 Against Defendants PAE, Easley, Greene, Pfundheller,
and Long in their Official and Individual Capacities**

93.     Mr. Irving realleges and incorporates the allegations set forth in ¶¶ 1 through 92, as though fully alleged herein.

94.     In January of 2015, Mr. Irving was assigned to Kabul, Afghanistan as Department Program Manager.

95.     He engaged in activity protected under the First Amendment of the United States Constitution when he reported and opposed PAE's misappropriation of public funds assigned to the DOS contracts.

96.     In taking these actions, Mr. Irving spoke on a matter of public concern as a private citizen, not as the DPM.

97.     Mr. Irving's actions did not interfere with PAE's ability to provide effective and efficient services to the DOS, and thus his interest in expression on this matter of public concern

15

outweighed his employer's interest in providing effective and efficient services to the public via the DOS.

98.     In or about October 19, 2015, Mr. Easley gave Mr. Irving notice that his employment contract was being terminated. This notice followed almost immediately after Mr. Irving disclosed Mr. Easley's wrongful actions.

99.     At the time of termination, Defendants were acting under color of law inasmuch as Mr. Irving's termination of employment was a direct response to his consistent and diligent reports of fraud and noncompliance by PAE, and that those reports all pertained to the PAE's violations of law as described in ¶¶ 26-63.

100.    Defendant PAE took no corrective action with regard to Mr. Easley's misconduct during the time in which Mr. Irving attempted to work through proper channels within PAE to resolve the retaliatory actions against him. Those retaliatory actions included PAE conducting an HR investigation on Mr. Irving in Kabul just prior to his termination that led to Mr. Irving's termination, terminating him, and providing derogatory information about him during his PR investigation.

101.    Defendants' actions violated federal law, specifically 42 U.S.C. § 1983 and the First Amendment of the United States Constitution.

102.    PAE's termination of Mr. Irving deprived him of rights, privileges, and immunities guaranteed under 42 U.S.C. § 1983.

103.    As a result of Defendants' violation of federal law, Plaintiff Mr. Irving has suffered and continues to suffer economic and non-economic damages, including lost salary, emotional distress and reputational harm.

16

## COUNT III

### Breach of Contract Against Defendants PAE and Easley

104.    Mr. Irving realleges and incorporates the allegations set forth in ¶¶ 1 through 103, as though fully alleged herein.

105.    At the termination meeting on October 19, 2015, Mr. Easley offered Mr. Irving normal salary (base salary with the additional 70% plus-ups) and bonus through December 31, 2015 for a total of $85,615 to complete Mr. Irving's employment contract, plus PTO and benefits (life, medical insurance, etc.), and positive professional referrals. In return, Mr. Irving was to end his employment by close of business on October 20, 2016.

106.    Mr. Easley told Mr. Irving to accept the offer, stating that it would allow Mr. Irving a reasonable amount of time to find new employment.

107.    Mr. Irving repeated Mr. Easley's offer twice to make sure he fully understood what Mr. Easley was offering him.  When Mr. Easley confirmed, Mr. Irving accepted Mr. Easley's offer.

108.    Contrary to the terms that Mr. Irving and Mr. Easley had agreed upon, the letter that PAE later sent Mr. Irving did not reflect the oral contract they had executed on October 19, 2015.  In that letter, PAE offered him only $11,205.00.

109.    Defendants failed and refused to tender their performance as required by the contract, which constituted a breach of contract.

110.    Plaintiff Mr. Irving has suffered damages as a result of Defendants' breach.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jeffry Irving prays this Honorable Court for Judgment against Defendants in an amount of economic damages, compensatory damages, plus attorneys' fees,

costs of this action, equitable relief, and any other relief this Honorable Court deems just and proper to award.

**MR. IRVING DEMANDS A TRIAL BY JURY.**

**Jeffry Irving**
By Counsel:

Monique A. Miles, Esq.
VSB # 78828
Old Towne Associates, P.C.
216 South Patrick Street
Alexandria, VA 22314-3528
Alexandria, Virginia 22314-3528
Ph: 703-519-6810
Fax: 703-549-0449
mmiles@oldtowneassociates.com

*Attorney for Plaintiff*