# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| **JEFFRY IRVING,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:16cv1617** |
| | ) | |
| **PAE GOVERNMENT SERVICES, INC.,** | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff, in this False Claims Act ("FCA")[1] retaliation and breach of contract case, asserts two claims: (i) that he was discharged in retaliation for engaging in FCA protected activity; and (ii) that defendant breached an oral severance agreement plaintiff claims he reached with defendant. Defendant now seeks summary judgment on both claims, contending that the undisputed factual record reflects that: (i) plaintiff did not engage in protected activity; (ii) defendant had no notice of any protected activity; and (iii) plaintiff was not terminated because of any alleged protected activity, but rather was terminated for legitimate, non-retaliatory reasons. Plaintiff opposes defendant's motion, arguing that a reasonable trier of fact could conclude that plaintiff was terminated because of his reports to his supervisors, which, in plaintiff's view, constituted protected activity. Further, plaintiff argues that defendant's stated reason for plaintiff's termination is pretext for retaliation. With respect to the breach of contract claim, plaintiff and defendant dispute whether under Virginia law a legally enforceable oral contract was created where, as here, the parties agreed that the contract would be reduced to writing for signature.

---

[1] 31 U.S.C. §§ 3729-3733.

Plaintiff, Jeffry Irving, is a resident of Alexandria, Virginia who formerly worked for defendant, PAE Government Services Inc. ("PAE"), a California-based government contractor that provides support services to U.S. government entities both domestically and internationally.

Defendant first hired plaintiff in 2010 as PAE Company International Security Manager/Chief of Security. In December 2014, plaintiff was hired as Deputy Program Manager ("DPM") on the BAS Contract based in Kabul, Afghanistan. Pursuant to the BAS Contract, defendant, in association with two subcontractors—GardaWorld and Olive Group North American ("OGNA"), provided mobile and static security services for the Department of State ("DOS"). In plaintiff's role as DPM, plaintiff was responsible for overseeing defendant's subcontracts, managing a group of employees who reported to him, and ensuring compliance with DOS contract requirements and other laws and regulations.

At issue in this case are four sets of reports that plaintiff made to his supervisors during his employment as DPM of the BAS Contract, including: (i) reports concerning allegedly noncompliant body armor; (ii) reports concerning the use of government vehicles to transport alcohol; (iii) reports concerning the arming of BAS Contract employees; and (iv) reports concerning false time reporting on the BAS Contract. Each of these reports is addressed in turn.

Plaintiff's reports with respect to body armor began in 2015. In early May 2015, OGNA conducted a field test on the body armor OGNA used on the BAS Contract and determined the body armor did not comply with OGNA's subcontract with defendant. In response to these test results, defendant directed OGNA to replace the body armor through a Corrective Action Request. Later that month, on May 19, 2015, plaintiff met with Janice Pfundheller

---

[2] This recitation of facts is derived from the facts listed in the parties' joint stipulation of uncontested facts and in defendant's list of undisputed facts to which plaintiff did not object in his opposition to summary judgment, as required. *See* Local Rule 56(B).

("Pfundheller"), defendant's Vice President of Governance and Institutional Development, and Devin Reynolds ("Reynolds"), defendant's BAS Static Security Chief, to discuss plaintiff's concerns about the OGNA body armor and the possibility of loaning defendant's body armor to OGNA. Plaintiff, Reynolds, and Pfundheller discussed the fact that defendant might need to obtain approval pursuant to International Traffic in Arms Regulation ("ITAR") prior to loaning defendant's body armor to OGNA. The day after the meeting, plaintiff, without first obtaining the ITAR approval, directed Reynolds to loan defendant's body armor to OGNA. After the loan of defendant's body armor to OGNA, plaintiff sought authorization from Brad Baldwin ("Baldwin"), defendant's BAS Senior Operations Specialist, for the body armor loan.

Shortly after loaning defendant's body armor to OGNA, plaintiff developed concerns about defendant's body armor, as well. Specifically, plaintiff was concerned that the body armor was not certified by the National Institute of Justice ("NIJ") pursuant to what plaintiff believed the BAS Contract required.[3] Plaintiff disclosed his concern about this body armor to Pfundheller. Then, without Pfundheller's approval or authorization,[4] on May 21, 2015, plaintiff directed Reynolds to conduct a field test of defendant's body armor. The body armor passed a 9mm handgun test, and Reynolds concluded that "the safety and protection of [the] team [was] not in jeopardy." Doc. 46 Ex. 24 at 2. Upon hearing about the unauthorized test of defendant's government-issued body armor, Stephen Easley, PAE's Senior Operations Manager, launched an investigation into the body armor issue.[5]

---

[3] Importantly, plaintiff has not cited to any portion of the BAS contract requiring NIJ certification for body armor or otherwise supporting plaintiff's concern.

[4] Although defendant did not approve the conduct of the test, the lead government Contracting Officer Representative ("COR") for the BAS Contract marked the vest to indicate that the COR validated the test. *See* Reilly Decl. ¶¶ 18-19.

[5] Defendant later replaced the body armor on the BAS Contract with NIJ-certified body armor at the request of the COR.

In addition to plaintiff's reports about defendant's body armor, plaintiff reported to his supervisors that defendant's BAS Contract staff was using government-funded equipment—vehicles—to transport alcohol. Plaintiff also reported to his supervisors that members of the BAS Contract staff were not armed even though plaintiff believed that the BAS Contract required those staff members to be armed. Finally, plaintiff reported to his supervisors that he saw some contractors sitting in the courtyard during the workday and therefore was concerned that the contractors' billing might not be accurate. It appears from the record that plaintiff never examined or reviewed any time records and that plaintiff reported concerns about billing because he was concerned about defendant's reputation and profits. *See* Pl. Dep. at 264:7-14.

On July 29, 2015, Easley arranged a meeting with plaintiff to discuss plaintiff's performance in his role as DPM. After the meeting, Easley formally documented and sent to plaintiff a list of plaintiff's performance issues including:

> (1) that plaintiff, without authorization, directed a test of body armor and that test involved the destruction of property belonging to the government;

> (2) that plaintiff failed to follow Pfundheller's direction to obtain ITAR clearance prior to loaning defendant's body armor to OGNA;

> (3) that plaintiff interacted negatively with other teams, subcontractors and partners;

> (4) that plaintiff displayed a negative attitude about defendant as a company; and

> (5) that plaintiff's abused his subordinate staff.

*See* Doc. 46 Ex. 35 at 1-2. Thereafter, on September 14, 2015, Mark Hunter, BAS Mobile Security Chief, sent Easley an email, complaining about plaintiff. Easley forwarded Hunter's complaint to LaTanya D'Antignac ("D'Antignac"), a member of defendant's Human Resources Department, who conducted an investigation into the allegations in the complaint. As a part of the investigation, D'Antignac interviewed plaintiff and several of his subordinates, including:

Hunter, Reynolds, Ralph Brugueras, Al Gopez, and Florencio Cortez. D'Antignac also interviewed two other DPMs, Mark Kennedy and Jon Dobre.

On October 12, 2015, after concluding her investigation, D'Antignac submitted her interview notes and investigative summary to Easley, Pfundheller, and Kathleen Long, the Director of Human Resources. D'Antignac's investigation substantiated Hunter's allegations against plaintiff, including plaintiff's failure of leadership and intimidation or harassment of his subordinates. Specifically, D'Antignac found that:

(1) plaintiff created a divisive workplace;

(2) plaintiff deliberately injured the feelings of and demonstrated a lack of respect for his employees;

(3) plaintiff did not demonstrate commitment to his leadership position on the BAS Contract;

(4) plaintiff had a reputation for being confrontational, hot-tempered and unreasonable;

(5) plaintiff failed to convey clearly assignments to his team resulting in poor or inadequate communication;

(6) plaintiff's continuous negative attitude created hostility and decreased employee engagement and satisfaction;

(7) plaintiff lacked the basic interpersonal skills needed to lead the BAS Contract effectively.

*See* Easley Decl. Ex. 8 at 39-40. Ultimately, D'Antignac concluded that defendant should terminate plaintiff. Based on D'Antignac's report, Easley, Long, and Pfundheller jointly made the decision to terminate plaintiff.[6]

Thereafter, on October 19, 2015, Easley, Long, and Pfundheller met with plaintiff in Virginia and informed plaintiff that his employment would be terminated. During the October

---

[6] Plaintiff disputes that defendant's decision to terminate plaintiff was a joint decision between Easley, Long, and Pfundheller, but plaintiff points to no record evidence to support this contention. Accordingly, there is no genuine dispute of material fact on this point.

19 meeting, Easley, Long, Pfundheller, and plaintiff discussed the terms of a severance package for plaintiff. All parties agreed that the severance package would be reduced to writing for the parties' signatures. The next day—on October 20, 2015—Long sent plaintiff a copy of a severance agreement for review and signature and officially terminated plaintiff's employment. There is no dispute that the parties agreed in the October 19 meeting that defendant would reduce the severance agreement to writing and present it to plaintiff the following day. Plaintiff contends that agreement on all severance terms was reached at the October 19 meeting and that the written agreement presented to plaintiff the next day did not reflect that agreement.

On December 30, 2016, plaintiff filed the complaint in this action. The complaint's remaining claims[7] include: (i) that plaintiff was discharged in retaliation for reporting alleged violations of the FCA; and (ii) that defendant breached an oral agreement created at the October 19 meeting by not paying plaintiff his full salary in the final severance agreement. On September 8, 2017, defendant filed the motion for summary judgment at issue here with respect to the remaining FCA retaliation and breach of contract claims.

In its motion for summary judgment, defendant argues that summary judgment is appropriate because (i) plaintiff's various complaints to his supervisors concerning body armor, alcohol transports, weapons, and time reporting did not constitute protected activity; (ii) defendant had no notice of any protected activity; and (iii) plaintiff was not terminated because of any protected activity. Instead, defendant contends that plaintiff was terminated for a

---

[7] The complaint originally named defendant, Easley, Long, Pfundheller, and Richard Greene, defendant's President of Global Logistics, as defendants. The complaint also asserted an additional claim alleging that PAE and the individual defendants discharged plaintiff for exercising his First Amendment rights in violation of § 1983. By Memorandum Opinion dated April 11, 2017, the § 1983 claim was dismissed with prejudice and the individual defendants were dismissed from the complaint. *See Irving v. PAE Gov't Servs.*, 249 F. Supp. 3d 826, 830-36 (E.D. Va. 2017) (dismissing individual defendants because FCA creates a cause of action against the employer but not against the employer's employees and dismissing the § 1983 claim because defendant, in discharging plaintiff, did not act under color of state law).

legitimate, non-retaliatory reason—plaintiff's poor management and interpersonal skills—and that there is no record evidence showing a triable issue of fact on whether that reason is pretextual. With respect to the breach of contract claim, defendant argues that there was no enforceable agreement between plaintiff and defendant as of the October 19 meeting because the parties clearly intended for any agreement to be reduced to writing. Plaintiff does not dispute that the parties intended to reduce the agreement to writing, but claims that all material terms of the severance agreement were orally agreed to at the meeting. These issues have been fully briefed and argued and are ripe for disposition.

## II.

The familiar standard for review of a summary judgment motion is too well-settled to warrant extended discussion. Under Rule 56, Fed. R. Civ. P., summary judgment is appropriate only where there is "no genuine dispute as to any material fact" such that the moving party "is entitled to judgment as a matter of law." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute exists if "there is sufficient evidence on which a reasonable jury could return a verdict in favor of the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating this question, courts must "view the evidence in the light most favorable to . . . the nonmovant." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The nonmovant, however, cannot rely on "mere allegations;" rather, the nonmovant "must set forth specific facts that go beyond the mere existence of a scintilla of evidence." *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013) (internal quotations and citations omitted).

# III.

The FCA's retaliation provision prohibits retaliation "because of lawful acts done by [an] employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1). To establish a prima facie case of retaliation under this provision, a plaintiff must show by a preponderance of evidence that: "(1) [plaintiff] engaged in protected activity; (2) the employer knew about the activity; and (3) the employer took adverse action against [plaintiff] as a result." *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 433 (4th Cir. 2015) (citing *Glynn*, 710 F.3d at 214).

With respect to the first prong of the prima facie case, the FCA establishes two categories of protected activity: (1) activities taken "in furtherance of an action" under the FCA, and (2) "other efforts to stop [one] or more" FCA violations. 31 U.S.C. § 3730(h)(1). The Fourth Circuit has evaluated the first category of protected activity by considering whether an employee's actions raised a "distinct possibility" of FCA litigation. *Mann v. Heckler & Koch Defenses, Inc.*, 630 F.3d 338, 344 (4th Cir. 2010). To meet this standard, a plaintiff need not actually file a qui tam suit; instead, the plaintiff need only investigate "matters that reasonably could lead to a viable FCA action." *Glynn*, 710 F.3d at 214 (quoting *Eberhardt v. Integrated Design & Constr. Inc.*, 167 F.3d 861, 869 (4th Cir. 1999)). The second category of protected activity encompasses activities "motivated by an objectively reasonable belief that the employee's employer is violating, or soon will violate, the FCA." *Carlson v. DynCorp Int'l LLC*, 657 F. App'x 168, 172 (4th Cir. 2016). Under either of these standards, the employee's conduct must relate to stopping real or suspected fraud because "without fraud, there can be no FCA action or violation." *Id.* at 174 (quoting *Mann*, 630 F.3d at 345-46).

The second prong of a prima facie case of FCA retaliation requires that the employer knew about the employee's protected activity. In the Fourth Circuit, "once an investigation involves [false or fraudulent] claims and the employee expresses concern to his employer that there actually is a likelihood of fraud or illegality, then the notice requirement is met." *Eberhardt*, 167 F.3d at 868. To establish the final prong of a prima facie FCA retaliation case, the plaintiff must show that there is a causal nexus between the plaintiff's protected activity and the adverse employment action.[8]

Once the plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to produce evidence of a legitimate, non-retaliatory reason for the adverse action. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[9] If the defendant

---

[8] Some courts have held that this prong establishes a "but-for" causation requirement as in Title VII retaliation claims while others have analyzed causation in FCA retaliation claims under a motivating factor standard. *Compare United States v. Solvay Pharm., Inc.*, 871 F.3d 318, 332 (5th Cir. 2017) ("[T]o survive summary judgment, Relators must point to evidence creating a genuine issue of material fact that their complaints were the but-for cause of their terminations."), *with United States ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1238 (D.C. Cir. 2012) (considering with respect to the FCA retaliation causation requirement whether "the employer's adverse action against the employee [was] motivated, at least in part, by the employee's engaging in [that] protected activity"). The Fourth Circuit, however, has not squarely addressed the applicable causation standard. In any event, the precise causation standard need not be identified here because the summary judgment analysis does not turn on causation.

[9] Although the Fourth Circuit has not explicitly held that the *McDonnell Douglas* burden-shifting framework applies in FCA retaliation cases, there is little doubt that the framework applies there as the Fourth Circuit has applied the framework in similar contexts, including retaliation claims under Title VII. *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). Moreover, other circuits and district courts in this circuit have routinely applied the framework to FCA retaliation claims. *See, e.g., Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172, 175 n.3 (5th Cir. 2016) ("We . . . apply the *McDonnell Douglas* framework to the False Claims Act's anti-retaliation provision."); *Harrington v. Aggregate Indus. Ne. Region, Inc.*, 668 F.3d 25, 31 (1st Cir. 2012) ("We hold . . . that the FCA's anti-retaliation provision is amendable to the use of the *McDonnell Douglas* framework."); *Schweizer*, 677 F.3d at 1240–41 ("The First Circuit recently held that the *McDonnell Douglas* framework applies to [FCA] retaliation claims. We agree[.]" (citing *Harrington*, 668 F.3d at 30–31)); *see also, e.g., Nifong v. SOC, LLC*, 234 F. Supp. 3d 739, 751 (E.D. Va. 2017) ("Here, because there is no direct evidence of retaliatory intent, the familiar *McDonnell Douglas* burden-shifting framework applies to the summary judgment motion."); *United States ex rel. Cody v. Mantech Int'l Corp.*, 207 F. Supp. 3d 610, 620–21, n.15 (E.D. Va. 2016) ("[A] retaliation claim under . . . the FCA is subject to the *McDonnell Douglas* burden-shifting analysis[.]"); *Huang v. Univ. of Va.*, 896 F. Supp. 2d 524, 554 (W.D. Va. 2012) (denying summary judgment where "reasonable jurors could conclude that Defendants' stated rationales for their decision . . . were merely a pretext for otherwise retaliatory action"); *Glynn v. Impact Sci. & Tech. Inc.*, 807 F. Supp. 2d 391, 416 (D. Md. 2011) (granting defendant summary judgment on FCA retaliation claim where defendant "easily demonstrate[d] that it had a legitimate, non-pretextual reason for terminating [plaintiff]"), *aff'd sub nom. Glynn*, 710 F.3d 209.

proffers a legitimate reason for the adverse action, the burden shifts back to the plaintiff to demonstrate that the defendant's stated reason is pretext for retaliation. *See id.*

## IV.

## A.

To satisfy the first prong of an FCA retaliation claim, plaintiff must adduce facts showing that plaintiff engaged in protected activity under either or both of the FCA standards. Plaintiff here alleges that plaintiff engaged in protected activity when he made reports to his supervisors concerning (i) body armor; (ii) alcohol transports; (iii) weapons; and (iv) time reporting.

To begin with, no reasonable juror could conclude that plaintiff's report about OGNA's body armor constituted protected activity under either the "distinct possibility" or "reasonable belief" standard. Importantly, that report did not involve any allegations of fraud on the part of defendant; indeed, it concerned only the subcontractor's body armor. The undisputed factual record discloses no evidence suggesting that defendant charged the government for its subcontractor's body armor or that plaintiff knew anything about how OGNA's body armor was purchased. The Fourth Circuit has made clear that "[w]ithout fraud, there can be no FCA action" and thus there can be no FCA-protected activity. *Carlson*, 657 F. App'x at 186 (quoting *Mann*, 630 F.3d at 345-46). Because there is no allegation that defendant made any representations with respect to OGNA's body armor, let alone fraudulent representations, plaintiff's reports about OGNA's body armor cannot be protected activity under either FCA standard.

Plaintiff's reports about defendant's body armor similarly do not fall within the first category of protected activity as those reports did not raise a "distinct possibility" of FCA litigation. *Mann*, 630 F.3d at 344. The Fourth Circuit has recognized that "[s]imply reporting [a] concern . . . to a supervisor does not suffice to establish that [plaintiff] was acting in

furtherance of a [False Claims Act] action." *Zahodnick v. Int'l Bus. Machines Corp.*, 135 F.3d 911, 914 (4th Cir. 1997) (internal quotation marks omitted). Instead, a plaintiff must adduce some evidence that the plaintiff "initiated, testified for, or assisted in the filing of a [False Claims Act] action during his employment." *Id.* Here, there is no evidence that plaintiff initiated, testified for or assisted with an FCA action related to defendant's body armor; plaintiff simply informed his supervisors of potential problems with defendant's body armor and asked that defendant resolve those problems. Merely reporting concerns to supervisors, absent additional evidence that plaintiff initiated or assisted in an FCA action, does not show that plaintiff acted "in furtherance" of an FCA action. *See id.*

A careful review of the record suggests that a closer question exists as to whether plaintiff's reports about defendant's body armor satisfy the "reasonable belief" standard for the second category of protected activity.[10] The "reasonable belief" standard requires that an employee's actions be "motivated by an objectively reasonable belief that the employee's employer is violating, or soon will violate, the FCA." *Carlson v. DynCorp Int'l LLC*, 657 F. App'x 168, 172 (4th Cir. 2016). The record here discloses some facts to suggest plaintiff believed defendant was violating the FCA. In his deposition, plaintiff testified that "[a]t the time [of his reports], [plaintiff] believed that the contract required NIJ-certified body armor"[11] and that the body armor defendant purchased with government funds was not NIJ-certified.[12] Plaintiff also notes that the COR told plaintiff that defendant was committing government fraud. By contrast, the record arguably contains no evidence demonstrating that these beliefs were objectively reasonable. Moreover, the record does not disclose the basis for the COR's belief

---

[10] Defendant's body armor is presumably covered by defendant's contract. Again, however, plaintiff cites to no provisions that require the purchase of a particular type of body armor.

[11] Pl. Dep. 2 at 131:23-132:8.

[12] Again, plaintiff fails to point to any provision of the contract expressing this requirement.

that fraud was occurring, nor does the record reveal information concerning the COR's knowledge of BAS Contract requirements or concerning whether plaintiff had any knowledge of defendant's claim for payment for body armor under the BAS Contract. As such, there is inadequate evidence to assess whether the COR's—and in turn, the plaintiff's—beliefs about the existence of fraud are objectively reasonable. Given that the question whether plaintiff's belief about fraud was objectively reasonable is close, it is appropriate to assume without deciding that plaintiff's reports about defendant's body armor constituted protected activity. Were the matter to go to trial, this question could be revisited at the Rule 50, Fed. R. Civ. P., stage of the trial.

Plaintiff's complaints about the alcohol transports on defendant's base do not fall into either of the categories of FCA protected activity because those complaints did not concern fraud on the part of defendant. The Fourth Circuit has made clear that to be protected activity under either FCA standard, an employee's activity "must concern false or fraudulent claims." *Glynn*, 710 F.3d at 214 (internal quotations omitted). The undisputed factual record discloses no evidence that defendant ever submitted a claim to the government with respect to the use of government-funded vehicles for alcohol transports. And, importantly, none of plaintiff's supervisors condoned the alcohol transports.[13] Indeed, Easley instructed plaintiff to stop the runs and to blame Easley for doing so. *See* Pl. Dep. 1 Ex. 26. Simply put, plaintiff's reports could not concern fraud on the part of defendant because defendant responded to plaintiff's conduct by agreeing with plaintiff and tasking him with preventing any alcohol runs in the future. *See Nifong*, 234 F. Supp. 3d at 754 (finding plaintiff's communications were not protected activity

---

[13] *See* Pl. Dep. 2 at 200:12-22; 217:10-15.

because "[plaintiff's] supervisor *commended* him for catching the potential billing overcharge and *instructed him to help correct it.*" (emphasis in original)).[14]

Next, no reasonable juror could conclude that plaintiff's reports concerning defendant's failure to arm certain personnel constituted protected activity under either the "distinct possibility" or the "reasonable belief" standard as those reports similarly did not concern government fraud. Plaintiff argues that he understood the BAS Contract to require that he, as well as several other employees, carry a weapon. Plaintiff, however, admitted that his concerns about weapons on the BAS Contract related to achieving performance objectives on the contract, not to government fraud.[15] Even assuming a failure to arm specific personnel amounted to a contract violation,[16] that failure would not constitute fraud because plaintiff alleges no "claim made on the public fisc that misrepresents the quality of a product in an effort to achieve an unwarranted payment for inferior goods." *Mann*, 630 F.3d at 346. Because both categories of protected activity require an allegation of fraud not present here, plaintiff's complaints about the arming of BAS Contract employees cannot constitute protected activity.

---

[14] *See also Brach v. Conflict Kinetics Corp*, 2017 WL 3267961, at * 16 (E.D. Va. July 31, 2017) (finding plaintiff's reporting of billing errors was not protected activity because "shortly after . . . [defendant] gave [plaintiff] additional authority over billing . . . .").

[15] For example, plaintiff testified in his deposition that:

> I brought [the weapons issue] up to the…CORs at the State Department, and it was something that was a high priority because I was being asked to achieve 100 percent compliance in the performance of the contract, and this was something that was holding me back. So I made it very clear that if you want me to achieve 100 percent, you got to help me get these weapons and get them issued properly and the proper training and license and all that, and they never did.

Pl. Dep. 2 at 254:20-255:5. And, when asked why plaintiff believed the weapons issues constituted fraud, plaintiff simply stated that "we were making all kinds of . . . diligent efforts to try to achieve 100 percent and full compliance, and we were invoicing that labor, but nothing was being done to assist me to acquire those weapons." *Id.* at 340:7-17.

[16] Again, there is no evidence on this point apart from plaintiff's assertion that he believed the failure to arm certain personnel was a contract violation.

Plaintiff's complaints about time reporting on the BAS Contract also fall short of falling within either category of protected activity. Plaintiff's complaints were not "in furtherance of" an FCA action because plaintiff's reports did not in occur in a context where FCA litigation was a "distinct possibility." *Mann*, 630 F.3d at 344. The Fourth Circuit has recognized that complaints "clearly couched in terms of concerns or suggestions, not threats or warnings of FCA litigation" do not raise a reasonable possibility of FCA litigation. *United States ex rel. Parks v. Alpharma, Inc.*, 493 F. App'x 380, 389-90 (4th Cir. 2012).[17] Although a contractor's submission of false time reports for payment could constitute fraud, plaintiff couched his allegations about time reporting as suggestions[18] and admitted that he reported the issues out of concern for defendant's profits and reputation.[19] Accordingly, no reasonable juror could find that those reports were "in furtherance" of an FCA action.

The time reports do not fall within the second category of protected activity because the record reflects that plaintiff did not have an "objectively reasonable belief" that defendant was engaging in fraud. *Carlson*, 657 F. App'x at 172. The undisputed factual record contains no firm evidence of any time reporting fraud. In fact, the only basis for plaintiff's complaint was his observation of some contractors sitting outside during the work day. Plaintiff does not contend that he ever reviewed any time reports from those contractors or that plaintiff was privy to defendant's submission of time reports to the government. Finally, plaintiff admits that he

---

[17] *See Zahodnick*, 135 F.3d at 914 (affirming summary judgment for defendant where plaintiff "merely informed a supervisor of [a] problem"); *Nifong*, 234 F. Supp. at 753 ("[M]ere expressions of concern that do not raise the reasonable prospect of false or fraudulent claims under the FCA . . . do not constitute protected activity." (internal quotation marks and citations omitted)).

[18] Specifically, in his deposition, plaintiff testified that "I recall that I couched it that way. That, hey, you know, if this is a problem, I want to know somebody, one, who knows about it at your level and two, you're doing something about it because this is—this is a big deal." Pl. Dep. 2 at 264:1-6.

[19] Plaintiff testified that he was concerned about the time reporting because "PAE [was] in the middle of potentially bidding on new contracts that [were] coming up" and that the time reporting issues "could impact PAE's top line and reputation in a very serious way." *Id.* at 264:7-14.

reported the time reporting issues out of concern for defendant's profits and reputation, not fraud. Accordingly, the undisputed factual record demonstrates that plaintiff did not believe defendant was engaged in fraud and had no objectively reasonable basis for any such belief. Thus, no reasonable jury could find that plaintiff's complaints about time reporting constituted protected activity.

In any event, given the current record, it is appropriate to assume without deciding that plaintiff's complaints concerning defendant's body armor were protected activity. None of plaintiff's other reports, however, satisfy the requirements of protected activity.

The second prong of the prima facie FCA retaliation case is satisfied here. Defendant clearly knew about plaintiff's protected activity because plaintiff reported his concerns about the body armor directly to both his supervisors and the government COR. The government COR then discussed the body armor issue with Easley, asking Easley for documentation of the body armor's compliance with the contract. *See* Reilly Decl. ¶¶ 13-14. Because a fact finder could conclude that these actions "would put the employer on notice that [FCA] litigation [was] a reasonable possibility,"[20] plaintiff has satisfied his burden with respect to the second element of the prima facie retaliation case.

Despite satisfying the first two prongs of the prima facie retaliation case, plaintiff fails to show a genuine dispute of fact demonstrating the final prong, namely that plaintiff was terminated as a result of plaintiff's protected activity. To begin with, defendant complained about the body armor in May 2015 but was not terminated until October 2015. In the Fourth Circuit, a substantial gap in time "weighs against a finding that it is more likely than not that the alleged protected activities played a role in [plaintiff's] termination." *Feldman v. Law Enfor't*

---

[20] *Eberhardt*, 167 F.3d at 868-69.

*Associates Corp.*, 752 F.3d 339, 348-49 (4th Cir. 2014). And, in retaliation cases, the courts in this circuit have found that a gap of three months, let alone the five-month gap at issue here, is too long to infer a causal nexus on the basis of timing alone.[21]

Furthermore, the undisputed factual record reveals that plaintiff was not disciplined or threatened because of his complaints about body armor. Indeed, defendant continued to employ plaintiff for several months after plaintiff reported the body armor issues, and the undisputed record reflects that defendant took seriously plaintiff's recommendations with respect to body armor. In this regard, Easley immediately flew to Kabul to conduct his own investigation into the body armor issue, worked to resolve the issue with the government COR, and made plans to purchase body armor compliant with the more rigorous NIJ certification. *See Brach*, 2017 WL 3267961, at *16 (finding plaintiff was not terminated as a result of alleged protected activity because defendant "took seriously [plaintiff's] recommendations," "reported [] errors to the government," and "continued to employ [plaintiff] for several more months."). Moreover, plaintiff adduces no record evidence of Easley criticizing plaintiff for raising the body armor issues with the government COR or with his supervisors.[22] In fact, Easley ultimately commended plaintiff, noting that plaintiff's intent was "positive and focused on employee safety." Doc. 46 Ex. 35 at 1.[23]

---

[21] *See, e.g.*, *Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012) (holding that "a three-month lapse is too long to establish causation, without more"); *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006) ("[T]hree to four months separat[ing] the [adverse action] and the claim protected activity . . . is too long to establish a causal connection by temporal proximity alone."); *Swann v. US Foods, Inc.*, 2015 WL 3793739, at *6 (E.D. Va. June 17, 2015) ("[C]ourts have consistently held that a period of three or four months between protected activity and adverse action is insufficient to establish a causal link between the two.").

[22] When Easley did express concerns about plaintiff's handling of the body armor issue, Easley focused on plaintiff's failure to obtain ITAR approval before loaning body armor to OGNA and plaintiff's destructive testing of the body armor without defendant's approval. *See* Doc. 46 Ex. 35 at 1.

[23] *See Nifong*, 234 F. Supp. 3d at 757 (finding no causation where "[plaintiff's] supervisor *commended* him for addressing [the issue] and *instructed* [plaintiff] to help correct it.").

In an attempt to overcome this undisputed record, plaintiff argues (i) that defendant did not treat Easley and Hunter in the same way when complaints were brought against those individuals; and (ii) that two of plaintiff's subordinates and the COR believed plaintiff was terminated because of the body armor incident. Neither of these arguments is a bar to summary judgment.

To begin with, Easley and Hunter are not valid comparators to plaintiff. The complaints against those individuals were neither as frequent nor as severe as the complaints made against plaintiff. The complaints against plaintiff were numerous detailed and led to a formal investigation that validated those complaints. *See* Easley Dep. at 28:8-19; 115:11-123:12. By contrast, the complaints against Easley and Hunter were isolated and minor. Specifically, plaintiff and Reynolds each complained about Easley once, expressing concerns about Easley's impartiality before his trip to Kabul. *See* Doc. 46 Ex. 44, 49. Significantly, neither plaintiff nor Reynolds reiterated this complaint after Easley's trip, suggesting their concerns had been resolved. The contrast with plaintiff is even more striking with respect to Hunter. Specifically, plaintiff sent one email to Easley about Hunter's lack of engagement at work in August 2015. *See* Doc. 46 Ex. 50.[24] This hardly rises to the same level as the many complaints concerning plaintiff that led to the formal investigation and his discharge. Also worth noting is that among the complaints registered against plaintiff is the complaint that plaintiff ordered the destructive testing of defendant's body armor without authorization. As the testimony of Easley and Pfundheller reflects, this, by itself, could rise to the level of a terminable offense. *See id.* at 105:13-105:8; *see also* Pfundheller Dep. at 134:1-19. In sum, Easley and Hunter are not valid comparators; the material differences between the complaints about these individuals and the

---

[24] Plaintiff also emailed Easley about Hunter's alleged substance abuse, but plaintiff sent that complaint immediately after plaintiff learned Hunter had filed a complaint against plaintiff. *See* Doc. 46 Ex. 54.

complaints about plaintiff suggest that different treatment of these individuals was warranted. Accordingly, the treatment of Hunter and Easley fails to support an inference of retaliation. *See Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) ( "There must be sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of [retaliation]." (internal quotations omitted)).

Plaintiff next points to the opinions of three individuals, Reilly, Reynolds and Christine Trostle,[25] who believe defendant terminated plaintiff because of plaintiff's body armor complaints. This evidence does not create a genuine dispute of fact as to the reasons for plaintiff's termination because the Fourth Circuit has long held that "it is the perception of the decision maker which is relevant [to a retaliation claim]," and the opinions of co-workers are "close to irrelevant." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) (citing *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)). Reilly, Reynolds and Trostle were not involved in the decision to terminate plaintiff. Indeed, Reilly did not even work for defendant, and Trostle resigned from the BAS Contract in July 2015, well before plaintiff was terminated. *See* Trostle Decl. ¶ 22. As such, these individuals' opinions about the reasons for plaintiff's termination are entirely irrelevant and thus do not create a genuine dispute concerning whether any protected activity engaged in by plaintiff was the cause of plaintiff's termination.

In sum, plaintiff has not demonstrated that defendant terminated plaintiff as a result of plaintiff's protected activity. Accordingly, plaintiff has not established a prima facie case, and defendant is entitled to judgment as a matter of law on plaintiff's FCA retaliation claim.

---

[25] Christine Trostle ("Trostle") was one of plaintiff's subordinates.

**B.**

Even assuming, *arguendo*, that plaintiff could establish a prima facie FCA retaliation case, plaintiff does not satisfy the *McDonnell Douglas* burden-shifting framework. Specifically, defendant has provided legitimate, non-retaliatory reasons for plaintiff's termination, and plaintiff has failed to identify record evidence demonstrating that those reasons are pretextual.

Defendant here offers ample record evidence of the legitimate, non-retaliatory reasons for plaintiff's termination, including plaintiff's poor management and interpersonal skills, insubordination, and unprofessional conduct. As the undisputed factual record shows, Easley and Pfundheller received complaints throughout 2015 about plaintiff's difficulty managing people and plaintiff's negative interactions with other teams. In May 2015, plaintiff committed what Easley and Pfundheller testified would ordinarily be a terminable offense by directing the destruction body armor without the express approval of his PAE supervisors. *See* Easley Dep. at 105:13-105:8; *see also* Pfundheller Dep. at 134:1-19. Almost two months later, on July 29, 2015, Easley formally documented plaintiff's performance issues and identified five chief areas of concern, including plaintiff's negative interactions with other teams and poor treatment of subordinates. A month and a half later, Easley received yet another complaint from one of plaintiff's subordinates. Thereafter, the Human Resources Department conducted a formal investigation and ultimately recommended plaintiff's termination based on his management failures and lack of interpersonal skills. Thus, this record provides extensive support for defendant's legitimate and non-retaliatory reasons for terminating plaintiff, namely plaintiff's poor job performance. And because courts have consistently recognized poor job performance

as a legitimate, non-retaliatory reason for termination under the FCA,[26] defendant has satisfied its burden of production under the *McDonnell Douglas* framework.

Importantly, plaintiff has not met his burden of establishing these reasons for plaintiff's termination are pretextual. Plaintiff offers three pieces of evidence in an attempt to demonstrate pretext: (i) the fact that defendant had only one email memorializing any formal complaint against plaintiff; (ii) an assertion that the investigation into plaintiff was biased; and (iii) the affidavits of three co-workers who believed defendant did not actually suffer from performance issues. Ultimately, plaintiff's evidence falls far short of that needed to overcome summary judgment.

Plaintiff's argument that defendant relies on only one email to support defendant's proffered reasons for termination mischaracterizes the record. In fact, the record reveals that although Easley may have only *formally* documented plaintiff's performance issues once, Easley received several informal complaints about plaintiff, including the complaint that prompted the HR investigation. *See* Easley Dep. at 28:2-19; 115:11-123:12. Moreover, D'Antignac conducted a formal investigation in which she interviewed several of plaintiff's subordinates, colleagues and plaintiff himself. The results of D'Antignac's interviews fully corroborated the areas for improvement identified in Easley's July counseling email.[27]

---

[26] *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) ("Job performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision" (citing *Texas Dep't of Comm. Aff. v. Burdine*, 450 U.S. 248, 258-59 (1981); *Young v. Lehman*, 748 F.2d 194, 198 (4th Cir. 1984)); *see also Elkharwily v. Mayo Holding Co.*, 823 F.3d 462, 471 (8th Cir. 2016) (finding defendant "articulated a legitimate, nondiscriminatory reason for terminating [plaintiff's] employment; namely, his poor job performance"); *Glynn*, 807 F. Supp. 2d at 416-17 ("IST easily demonstrates that it had a legitimate, non-pretextual reason for terminating Glynn: his bad behavior.").

[27] For example, D'Antignac found that plaintiff's "attitude demonstrate[d] a lack of respect for his employees" and that plaintiff "deliberately injure[d] [his staff's] feelings, and their self-confidence and pit staff members against one another thus creating tension amongst colleagues." Easley Decl. Ex. 8 at 39.

Recognizing this fact, plaintiff argues that D'Antignac's investigation was biased. Yet, plaintiff fails to identify any record evidence that persuasively supports that allegation. Plaintiff points simply to the fact that Easley forwarded D'Antignac Easley's July counseling email, arguing that email improperly biased D'Antignac. But importantly, in that very same email, Easley reiterates that he appreciates D'Antignac's "unbiased opinion on the issue." Doc. 46 Ex. 15 at 1. Plaintiff also suggests the fact that D'Antignac interviewed the individuals Easley flagged demonstrates D'Antignac's bias. But this allegation ignores the fact that D'Antignac also independently interviewed both plaintiff himself and Reynolds, one of the subordinates who filed complaints against Easley and consistently supported plaintiff. *See* Doc. 46 Ex. 41 at 2-7. D'Antignac's interview list thus suggests thoroughness and not bias. *See Elkharwily*, 823 F.3d at 471 (finding plaintiff failed to demonstrate poor performance was pretext for retaliation where "evaluations were confidential, based on feedback from numerous staff interviews, and performed independently of each other.").[28]

Finally, plaintiff relies on the affidavits of two of his subordinates and the COR to argue that plaintiff did not, in reality, suffer from any performance issues. This evidence does not create a triable issue of fact on whether defendant's legitimate non-retaliatory reasons are pretext for retaliation; as the Fourth Circuit has made clear, it is the decision-maker's evaluation of plaintiff's job performance that matters, not the plaintiff's evaluation of his own job performance or the evaluation of the plaintiff's coworkers. *See Hawkins*, 203 F.3d at 280 (citing *DeJarnette*,

---

[28] Plaintiff also contends that the grammatical errors in D'Antignac's report are evidence of carelessness. Yet, D'Antignac makes clear in her email transmitting her notes that the notes might contain grammatical errors as they are preliminary. *See* Doc. 46 Ex. 41 at 1. Moreover, if grammatical errors were evidence of lack of attention to an important task, plaintiff would suffer from the same infirmity. *See* Doc 46 at 4 ("Mr. Irving looked forward to progressing up the corporate ladder within PAE, but it become evident to him that due to his fraud complaints to PAE superiors in 2015, that they were intent on firing him for being the "squeaky wheel", not to mention that his boss, Stephen Easley knew that Mr. Irving had reported fraud to the lead U.S. Department of State ("DOS") contracting officer ("COR"), Patrick Reilly for him to intervene.").

133 F.3d at 298-99). In *Hawkins v. PepsiCo Inc.*, the Fourth Circuit rejected the argument that a plaintiff's self-evaluation could create an issue of fact, noting that "it is the perception of the decision maker which is relevant [to a retaliation claim]." *Id.* Specifically, the *Hawkins* Court rejected the plaintiff's argument because "instead of producing evidence that [the employer's] assessment of [the plaintiff's] performance was dishonest or not the real reason for her termination . . . [plaintiff] disputes the merits of [defendant's] evaluations." *Id.* Here, plaintiff's argument that plaintiff was a good manager does just that—it merely disputes the defendant's evaluation without showing that defendant's assessment of plaintiff's performance was dishonest. Accordingly, this evidence does not create a genuine dispute of fact that defendant's reasons for terminating plaintiff were pretextual.

In sum, defendant has met its burden to produce a legitimate, non-retaliatory reason for discharging plaintiff, and plaintiff has failed to show that defendant's stated reasons are pretext for retaliation. Accordingly, defendant is entitled to summary judgment on plaintiff's FCA retaliation claim.

## V.

The only remaining issue is plaintiff's breach of contract claim. Under Virginia law,[29] a breach of contract claim requires: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *CoreTel VA., LLC v. Verizon Va., LLC*, 808 F.3d 978, 982-83 (4th Cir. 2015) (quoting *Ramos v. Wells Fargo Bank, NA*, 770 S.E.2d 491, 493 (Va. 2015)). With respect to the first element, where parties "intend to culminate their agreement with a signed contract, there is a strong presumption that no contract exists until a

---

[29] The parties both apply Virginia law in analyzing the breach of contract claim, and the meeting at which an oral agreement was allegedly formed occurred in Virginia. Accordingly, Virginia law governs here.

contract is formally signed and in writing." *Moorman v. Blackstock, Inc.*, 276 Va. 64, 76-77 (2008). And importantly, overcoming that presumption requires "strong evidence." *Id.* at 77 (quoting *Andrews v. Sams*, 233 Va. 55, 58 (1987)). In this respect, "'agreements to agree' are uniformly unenforceable in Virginia." *Zoroastrian Ctr. v. Rustam Guiv Found. of N.Y.*, 822 F.3d 739, 752 (4th Cir. 2016) (quoting *Allen v. Aetna Cas. & Sur. Co.*, 222 Va. 361, 363 (1981)).

The undisputed facts here show that plaintiff and defendant entered into an agreement to agree at the October 19 meeting and thus plaintiff cannot enforce the terms discussed at that time. Specifically, although plaintiff argues in his opposition to summary judgment that he believed he was entering into a contract at the meeting, plaintiff admits in his deposition that Easley, Long and Pfundheller told plaintiff that "a severance agreement would be offered to [plaintiff] the next day . . . ." *Id.* at 45:9-14. Indeed, plaintiff acknowledged that he expected to receive a written agreement to sign because "[Easley, Long, and Pfundehller" told [plaintiff] that they would send [him] one." Pl. Dep. 1 at 47:2-6. Because the parties intended to reduce the agreement to writing for signature the day after the October 19 meeting, there is a strong presumption that no oral contract was formed at the meeting. Yet, plaintiff offers no evidence to overcome that strong presumption, arguing only that Easley had authority to enter into a contract as defendant's agent. The mere fact that an agent has authority to enter into a contract, does not mean that the agent actually has entered into a contract. In sum, plaintiff offers no evidence to overcome the strong presumption that no contract was formed during the October 19 meeting.

Because there was no legally enforceable contract formed between defendant and plaintiff during the October 19 meeting, there can be no breach. Accordingly, defendant is entitled to summary judgment on plaintiff's breach of contract claim.

An appropriate order will issue.

Alexandria, Virginia
November 1, 2017

/s/

T. S. Ellis, III
United States District Judge